## Watson v. Commonwealth.

### (Decided March 6, 1936.)

H. H. OWENS and G. W. HATFIELD for appellant.

REVERLY M. VINCENT, Attorney General, and J. J. LEARY, Assistant Attorney General, for the Commonwealth.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Prior to and on April 27, 1934, the appellant, Eddison Watson, and his codefendant in the indictment, Crit Crabtree, were deputy sheriffs of McCreary coun-

ty, while Riley Robbins was constable in the magisterial district embracing Pine Knott, in that county. In the late afternoon of that day, Clarence Cooper, while intoxicated, proceeded to demonstrate to the populace that he was in the town of Pine Knott, which he made known by cursing and swearing and riding over the streets "a shooting of his pistol." Robbins procured a warrant for his arrest from the justice of the peace of the district and went to the home of appellant, Watson, to get him to assist in arresting Cooper. Crabtree happened to be at Watson's residence at that time, and the three got into an automobile belonging to one of them and started on their mission to execute the warrant, which they soon did by arresting Cooper and taking him into the automobile. For some reason they then drove to an outlying village about two miles from Pine Knott and then returned thereto when Cooper, as he passed a grocery, expressed a wish to go into it for some purpose. The constable (Robbins) accompanied him into the grocery, while the two deputy sheriffs remained waiting in the automobile. Robbins soon returned and announced that Cooper had escaped. His father, where he made his home, lived not far distant from Pine Knott, and between the Cooper residence and the town there was a church building. The three officers divined that Cooper would eventually attempt to return to his father's residence, and they stationed themselves about that church for the purpose of apprehending him if he should chance to appear.

The constable was on the lower side of the church building, while the two deputy sheriffs were on its upper side. There was a footpath along a ravine which passed near to the church and it mostly, if not entirely, traversed woodlands. Within a short while after the officers so placed themselves, they heard some one walking along the path towards them and who at that time was 500 feet or more away from them, the noise of the pedestrian being made by the rattling of leaves and other sounds. Upon hearing that noise, the two deputy sheriffs, as they testified, suspected that the pedestrian traveler was the escaped prisoner, and they stationed themselves near the path—appellant on its lower side and Crabtree on its upper one. The constable had also discovered the approaching traveler of the path, and he testified that he approached them and told them that their suspect was old man Sam Jones

and not Cooper. Appellant denied that the constable made any such statement, and Crabtree testified that if it was made he did not hear it. At any rate, the constable, after giving such information (if he did so), retired to his former position with the church building between him and the other two officers. Within a short while he heard a number of shots, and upon going to the scene where they were made he discovered the decedent, Sam Jones, mortally wounded, from the effect of which he soon died, the fatal shot appearing to have entered his back, while the other one penetrated one of his arms.

Appellant, in giving his account of the way and manner the homicide occurred said: ''Well, when he came on up there why—in about—I judge four or five steps of me I holloed, 'Halt, consider yourself under arrest,' and I flashed my light on him when I said that and seen who he was and I said, 'Hello Mr. Jones,' I said, 'I thought you was Clarence Cooper' or started to say that and he didn't give me time to. He just come with his gun out from under his overall bib here and shot a shot it looked like straight toward me and I dropped back to the left and then he wheeled and throwed his gun on Crabtree and I went to shooting.'' Crabtree in describing the same occurance did so in this language: ''Well, this man come walking up and Eddison (appellant) turned his flashlight on him — flashed it right on him and called him Mr. Jones — said 'Hello, Mr. Jones' and he started to say something else and didn't get it out until he jumped down the hill —jumped down to his left like * * * Well, then the old man Jones when he flashed the light he come out from under his overall bib with a gun and I saw the flash of the gun and in about a minute the other one flashed. * * * And then there was a couple or three more shots —shot fast, something like that(indicating).''

He later stated that the decedent was facing appellant throughout the shooting and did not turn towards him until after the shooting ceased, when he (witness) took hold of him and assisted in laying him down. The two deputy sheriffs retired from the scene, but left Robbins in charge of the body of Jones. They were later indicted, charged with murder, and upon the separate trial of appellant he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for five years. This is an appeal from the ver-

dict and the judgment pronounced thereon after the court overruled appellant's motion for a new trial.

In the classification of points in brief for appellant but two alleged grounds are relied on as errors, and which are: (1) That the verdict is flagrantly against the evidence; and (2) that "there is no instruction submitting to the jury, officer instruction, or theory of the defense presented by the defendant." However, the first ground is subdivided in brief into: (a) That the verdict is flagrantly against the evidence, "in that it is a physicial impossibility for the defendant to have inflicted the wound that brought about the death of the deceased except in defense of Crabtree"; (b) "even positive testimony may be contradicted by circumstances"; (c) that "it is the duty of the court to set aside a verdict flagrantly and palpably against the evidence", and (d) "an expert witness will not be heard to contradict well known facts and physical laws." While the analysis of points discussed and relied on are so indexed in brief of counsel, nevertheless the body of his brief refers to some alleged errors in the admission of testimony and to which we shall later refer. We will dispose of and determine the two general grounds, including the subdivisions of ground 1 in the order named; but before proceeding to do so we deem it proper to state that the court in appropriate instructions submitted to the jury the issue of appellant's guilt of willful murder, and its embraced offense of voluntary manslaughter; and gave to it the appropriate reasonable doubt instructions, followed by the self-defense instruction, of which no complaint is made, and which directed the jury to acquit appellant if he did the killing in his necessary self-defense or that of Crabtree.

Returning now to a discussion of the grounds stated, it is first argued in support of ground 1 that the testimony of Watson and Crabtree, the only eyewitnesses to the homicide, if literally accepted as true, made out an unassailable case of self-defense which was the only one interposed or relied on as justifying appellant's action in shooting and killing the deceased. From that premise it is argued in the body of the brief that a directed verdict of acquittal should have been given, but if mistaken in that, then the verdict is unsupported by and flagrantly against the evidence. But the argument is by no means convincing and cannot be sus-

tained—even without the testimony of Robbins that he had previously informed the deputy sheriffs that the approaching person who was later killed was not the escaped prisoner but was decedent, whom the proof showed was returning from the residence of his son-in-law to his home, and where he had spent the day planting potatoes. The argument assumes appellant's right as an officer to accost the deceased in the circumstances and in the manner described so as to invite the defensive conduct of deceased, as described by appellant and his witness Crabtree, and to then kill him in defending against that invited conduct. The testimony of appellant was and is to some extent contradicted by that of his companion, who, it will be remembered, said in giving his testimony that deceased did not turn toward him or make any effort to shoot him (Crabtree). but which appellant said was his excuse for firing the fatal shot.

There are other contradictions made by the one of them of the other found in their testimony, but which we deem it unnecessary to recite or discuss, except to say that they tended to discredit appellant's theory of his completely established right (by his own testimony) to kill the deceased under an unqualified self-defense exoneration. But eliminating such contradictions and treating the case as if the testimony of appellant and Crabtree completely harmonized on all material points, the argument cannot be sustained for the reasons hereinafter set forth in our disposition of ground 2, supra, and for the further reason that it ignores the testimony of the constable, Robbins. His statement as it related to the immediate occurrences, after first describing the arrest of Cooper and his escape, is thus phrased: "I started around the right-hand side of the church house and they went around the left, I suppose, and the next thing I knowed I was below them or off to the right of them. And there was a little mound there where you go in the church—a little mound—oh—I don't know how high and I heard a racket and I looked around and one or t'other of them, I thot it was Edd—I didn't look up to see—motioned for me to come back that way. And I come back and I got in four or five feet of them and I saw old man Sam Jones come walking along toward the highway. And I told them, 'That's not the man we're after. That's old man Sam Jones.' And they said, 'Come on, let's get him.' And I said, 'No,

that's not the man we're after, let's go down and get Clarence.' And they said 'Come on.' And I said, 'No, I am not going back after him.' '' If the jury believed that testimony, which it had the right to do, then appellant's only excuse for assaulting deceased in the manner described (i. e., that of mistaken identity) falls to the ground and he is left without any (even plausible) reason for the homicide that he admits he committed. However, for the reasons to be set forth in our discussion of ground 2, supra, appellant is not entitled in the circumstances of this case to invoke the self-defense protection and which renders all of the arguments in support of ground 1 of no avail, even though the testimony of Robbins should be eliminated from the case.

■ In support of this ground counsel, as we have seen, insist that the court should have given to the jury what he terms an ''officer instruction'' and which we interpret to mean that the court should have submitted to the jury the rights of an officer in arresting a person who had committed some depredation and whom the officer had the right to arrest, and was actually seeking to make his arrest; but we have no such case here. The deceased had committed no offense, nor was the officer engaged in seeking his apprehension. If, as we have said, appellant's testimony should be viewed literally, and not as modified by that given by the constable, Robbins, we would then have a case where an officer in seeking the actual culprit accosted an innocent man with the exclamation as given by him, ''Halt, consider yourself under arrest,'' followed by an immediate flashing of his light in the face of the innocent addressee. In our opinion in the case of Johnson v. Williams' Adm'r, 111 Ky. 289, 63 S.W. 759, 761, 23 Ky. Law Rep. 658, 54 L.R.A. 220, 98 Am.St.Rep. 416, there was presented and determined by us the identical question of the right of an arresting officer under the identical facts herein involved, and in which we held that he could not excuse the consequences of his actions on the ground of such mistaken identity, and that such mistake on his part furnished no defense for the consequences that he thereby produced. The facts in that case, briefly stated, were: One Browder had murdered another in the city of Hickman, Ky. He resided between the scene of his murder and the city of Fulton, in the same county, but off the road connecting them.

Two deputy sheriffs were then in Fulton, and their principal, the sheriff, telephoned them from Hickman of the murder and directed them to arrest Browder, who had left Hickman in a buggy drawn by a gray horse. The two deputies knew where the road turned off from the one connecting the two cities. They went to that place, and almost immediately a man approached from the direction of Hickman in a buggy drawn by a gray horse. He turned into the road leading to Browder's residence. The two deputies addressed the driver in practically the same language as that employed by appellant in this case, but instead of halting he applied the lash to the animal he was driving and speeded away when the officers, who were armed with rifles, fired at and killed him. It turned out that the man who was killed was not Browder at all, but was Charles Williams, who was totally innocent of any law violation. The sheriff and his surety were sued by the administrator of the deceased to recover for his death, and a judgment was obtained in the circuit court which this court affirmed.

In determining the exact point now under consideration, and which was sharply involved in the case, we said: "He [arresting officer] cannot justify the wrongful arrest by showing he believed, and had reasonable grounds for believing, that he was executing it upon the party named in it. If he cannot in that way justify a wrongful arrest, much less should he be permitted to justify the killing of another by showing that he had probable cause for believing that he was shooting at the party whom he was authorized to arrest. The law which gives an officer the right to kill an escaping felon certainly requires him to know that it is the felon, not an innocent party whose life he is attempting to take. The question here is quite a different one from what we would have if the deputy sheriffs had shot at Browder while escaping, and killed Williams. In the latter case they would have been shooting at the right man, if the facts justified it, but here they shot at and killed an innocent man." That case, as indicated above, was published in 54 L.R.A. as well as in 98 Am.St.Rep., and it is cited in many later texts upon the question, written since that case was decided. We have searched all available sources and have found no adjudication or text statement contradicting that excerpt. It was bottomed upon our then conclusion, and which we now

approve, to the effect that a modification of that rule whereby an arresting officer in the circumstances might excuse himself from the consequences of such mistaken identity would be an extremely dangerous one and could easily be employed to shield and protect him from any revengeful action that he might take toward the injured person and be relieved of the consequences thereof.

Human life and individual liberty are both too sacred to hazard the safety of either by the promulgation or adoption of any contrary rule. It is therefore considered by the law that by far the greater benefit to society is subserved by holding the arresting officer to strict accountability for accurate identification of the prisoner whom he seeks to apprehend rather than permit him to shelter behind his mistaken identity, even though such mistake was innocent on his part. As a result of that conclusion appellant herein was not entitled to what his counsel term an "officer instruction." However, such an instruction could not have benefited appellant in this case, since the issue submitted by the court to the jury in the self-defense instruction made no reference to any preceding conduct of appellant calculated to provoke deceased to exercise his right of self-defense and to deprive appellant of the same right. As given it left the jury to determine (without considering any such provoking conduct) whether or not the appellant *at the time* he commenced to shoot believed, or had reasonable ground to believe, that he or Crabtree were *then* in danger of death or bodily harm, and that it was necessary to so shoot in order to avert such reasonably apprehended danger. There was no modification of the instruction qualifying any such right by anything that had preceded the commencement of the shooting. The jury, therefore, was authorized to acquit appellant if it believed that the deceased had placed him or Crabtree in danger and that it thereby became necessary in order to avert it that appellant should shoot him and which, we repeat, eliminated from the consideration of the jury all questions relating to the blame on the part of appellant for the beginning of the trouble. The jury did not believe the testimony of the defense, as is demonstrated by its verdict, and under no rule of practice are we authorized to disturb it. Officers in making arrests are vested with broad powers in the apprehension of offenders of the criminal law, but they should make sure of their prey

before exercising them, and which is a most wholesome rule for the protection of the lives and liberties of the citizens.

The principle announced in the Johnson Case, supra, was approved by us in the more recent one of McMahan's Adm'x v. Draffen, 242 Ky. 785, 47 S.W.(2d) 716, 718, and from our opinion therein we take this excerpt: "It is the duty of the officer executing it (search warrant) to know·with certainty that the premises, things, or the person he is searching is the premises, person or thing, which he is authorized and directed by the warrant to search. Johnson v. Williams' Adm'r, 111 Ky. 289, 63 S. W. 759, 23 Ky. Law Rep. 658, 54 L. R. A. 220, 98 Am. St. Rep. 416." It is true that the warrant to be executed in that case was one of search and seizure and not for the apprehension of an individual law violator, but the principles announced therein as to the required certainty of identity of the premises to be searched under the character of warrant there involved are equally applicable as to the certainty of identity of the *person* to be arrested under a warrant of arrest, and the same consequences follow the mistake of the officer in each case. Our research discloses that under some extreme and rare circumstances an exception might exist to the broad doctrine of the Johnson case, but neither this case nor the Johnson one possesses any such facts. An illustration of· such extreme case would, perhaps, be when the officer was unaware of two persons of the same name as that contained in the warrant, or of the one who had committed an offense, and for whom he was searching, and in the exercise of the proper diligence mistook another person possessing the same name as the truly guilty one. But we have no such case as that, and appellant's rights herein are governed by the principles of the Johnson opinion, approved, as we have seen, in our later McMahan one.

The complaints made in the body of the brief with reference to the admission of testimony are clearly immaterial. The most serious one (even if it could be so classified) is the proof of some statements made by Crabtree within twenty or thirty minutes after the homicide and out of the presence of appellant. They were that appellant did the shooting, and which he confessed but seeks to avoid under his right of self-defense. Moreover, that testimony of Crabtree was

proven by the commonwealth in rebuttal after appellant's counsel himself had laid the foundation therefor.

Our careful consideration of the record discloses no legal ground for disturbing the verdict, and the judgment is affirmed.